**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SHIMEARA WATSON,**<br>**Plaintiff,**<br>**v.**<br>**DOUGLAS A. COLLINS, SECRETARY OF VETERANS AFFAIRS,**<br>**Defendant.** | **CIVIL ACTION NO. 24-3043** |

**MEMORANDUM OPINION**

**Rufe, J.** **August 26, 2026**

Plaintiff Shimeara Watson filed the instant action against Defendant Secretary of Veterans Affairs, alleging Title VII disparate treatment (Count I), hostile work environment (Count II), and retaliation (Count III). Following discovery, Defendant filed a Partial Motion for Summary Judgment on Counts I and III.

## I. BACKGROUND

Ms. Watson is a current employee at the Corporal Michael J. Cresecenz Veterans Affairs Medical Center ("Philadelphia VAMC" or "VA").[1] She began her employment on May 26, 2020, in the position of Housekeeping Aide within the Environmental Management Services Department ("EMS").[2] On February 12, 2020, Ms. Watson was promoted to the position of Housekeeping Aide (Leader) within EMS.[3] From January 2024 until April 2024, she worked as a Detail Supervisor.[4] She remains employed as a Work Leader.[5] From 2022 to 2024, Ricardo

[1] Def.'s SMF, Ex. 3,Watson Dep. at 11 [Doc. No. 17-3].

[2] Def.'s Statement of Material Facts ("Def.'s SMF"), Ex. 1, 5/26/2020 SF-50 [Doc. No. 17-1].

[3] Def.'s SMF, Ex. 2, 2/13/22 SF-50 [Doc. No. 17-2].

[4] Def.'s SMF, Ex. 4, Watson Resume [Doc. No. 17-4].

[5] Def.'s SMF, Ex. 3, Watson Dep. at 11 [Doc. No. 17-3].

Lindsay was Ms. Watson's immediate supervisor at the VA.[6] Also in her chain of command were Charles Carter, Calvin Johnson, and Rezaur Rahman.

Ms. Watson reports experiencing harassment based on her sex beginning in June 2022, including: her coworkers repeatedly referring to her as a man, stating that she wouldn't be fired because she was a man, repeatedly asking questions about her gender, commenting on her sexual orientation, asking her to prove she was a female by exposing herself, asking about her sex life, making insulting comments about her gender identification and sexual orientation, and whispering and laughing at her.[7] Ms. Watson also states that one coworker, Deitra Jackson, asked her "don't you have a penis?" and said "you told me you was a man" and "you are a man and cannot carry a baby."[8] Ms. Watson reported that she advised management of the incidents but that her complaints were dismissed.[9]

Following these concerns, EMS "conducted a service-wide training on 'gender pronouns/harassment,' . . . with the purpose . . . to make clear harassment 'won't be tolerated.'"[10] Ms. Watson claims this training was ineffective and engendered additional taunts and jokes about Ms. Watson's gender, she experienced the training as harassing and "disgusting," and that Mr. Lindsay told her the training was being held because of her and said "you . . . could be whatever you want to be," which Ms. Watson believed was an insinuation that she was a man.[11]

---

[6] Def.'s SMF, Ex. 5, Lindsay Dep. at 6-7 [Doc. No. 17-5].

[7] Def.'s SMF, Ex. 9, 7/28/23 Letter from Dep't of Veterans Affairs [Doc. No. 17-9].

[8] *Id.*; Def.'s SMF, Ex. 6, 3/9/23 EEO Complaint [Doc. No. 17-6].

[9] *Id.*

[10] Pl.'s Add'l Statement of Material Facts ¶ 53 [Doc. No. 19-2]; Def.'s Resp. to Add'l Statement of Material Facts [Doc. No. 21].

[11] Pl.'s Add'l Statement of Material Facts ¶¶ 16-18 [Doc. No. 19-2]; Ex. A, Watson Dep. at 149-150, 161-162 [Doc. No. 19-3].

Other employees testified that the training "was made a joke out of" and did not resolve the issues.[12]

Ms. Watson claims that since 2023, management stopped assigning her "work leader duties" despite being a Work Leader.[13] Defendant denies this claim.[14]

On March 9, 2023, Ms. Watson filed an Equal Employment Opportunity ("EEO") complaint with the Department of Veterans Affairs, wherein she alleged she was the victim of harassment and a hostile work environment on the basis of sex, gender identity, and sexual orientation.[15] The complaint was accepted on July 28, 2023, and raised a claim of:

> Whether [Ms. Watson] was subjected to a hostile work environment (sexual) based on sex (female and LGBT) when beginning on or about June 7, 2022 and continuing to February 8, 2023, [Ms. Watson's] coworkers: a) repeatedly referred to her as a man; b) said she wouldn't be fired because she was a man; c) repeatedly asked her questions about her gender and made comments about her sexual orientation; d) asked her to prove she was female by showing her private parts; e) inquired about her sex life . . . while making insulting comments about her gender identification and sexual orientation; f) asked her "Don't you have a penis?"; g) said "You told me she was a man" and "You are a man and cannot carry a baby"; h) said [Ms. Watson] said she was a man, which was completely fabricated; i) whispered about her and laughed at her; and j) despite advising management of these incidents, her manages dismissed and minimized them, which caused [Ms. Watson] to feel humiliated, anxious, depressed and to experience panic attacks.[16]

On May 22, 2024, Ms. Watson was provided with a "Right to File a Civil Action" following denial of her first EEO complaint.[17]

---

[12] Pl.'s Add'l Statement of Material Facts ¶¶ 43, 71, 91, 115-16 [Doc. No. 19-2]; Ex. B, Shaneese Washington Dep. at 8 [Doc. No. 19-4] ("They had a gender pronoun training, but it was completely made a joke out of. Our supervisor, while training us, he was completely laughing, making disrespectful comments and stuff the entire time. And then right after we left out of there another supervisor was making jokes and stuff not even an hour later."); Ex D, Daaiyah Washington Dep. at 10 [Doc. No. 19-6]; Ex. F, Harper Dep. at 9-10 [Doc. No. 19-8]; Ex. I, Lindsay Dep. at 12-13 [Doc. No. 19-11].

[13] Pl.'s Add'l Statement of Material Facts ¶ 30 [Doc. No. 19-2]; Ex. A, Watson Dep. at 60 [Doc. No. 19-3].

[14] Def.'s Resp. to Add'l Statement of Material Facts ¶ 30 [Doc. No. 21].

[15] Def.'s SMF, Ex. 6, 3/9/23 EEO Complaint [Doc. No. 17-6].

[16] Def.'s SMF, Ex. 9, 7/28/23 Letter from Dep't of Veterans Affairs [Doc. No. 17-9].

[17] Def.'s SMF, Ex. 10, 5/22/24 Notice of Right to Sue [Doc. No. 17-10].

On October 26, 2023, Ms. Watson applied for a Housekeeping Aide Supervisor position, which was listed at vacancy announcement CBSZ-12176711-24-SC.[18] This position was cancelled, and no one was hired for this vacancy.[19] Defendant stated in response to an interrogatory that the position was canceled due to a clerical error.[20]

On December 6, 2023, Ms. Watson applied for a Housekeeping Aide Supervisor position, which was listed at vacancy announcement CBSZ-12224495-24-SC.[21] The position was cancelled, and no one was hired for this vacancy.[22] Defendant stated in response to an interrogatory that the position was canceled due to an administrative error.[23]

On December 30, 2023, Ms. Watson applied for a Housekeeping Aide Supervisor position, which was listed at vacancy announcement CBSZ-012256575-24-SC.[24] The VA interviewed Ms. Watson for this vacancy, but she was not ultimately selected for the position.[25] Ms. Watson was interviewed by a panel of three interviewers, who separately interviewed her and each assigned scores following the interview.[26] Two of the interviewers claimed in affidavits that they were unaware that Ms. Watson had filed EEO complaints prior to the interview, and

[18] Def.'s SMF, Ex. 15, CBSZ-12176711-24-SC Application Information [Doc. No. 17-15].

[19] Def.'s SMF, Ex. 17, 11/8/23 Certificate of Eligibles [Doc. No. 17-17]; Ex. 16, Def.'s Resp. to Interrogatory 9 [Doc. No. 17-16].

[20] Def.'s SMF, Ex. 16, Def.'s Resp. to Interrogatory 9 [Doc. No. 17-16].

[21] Def.'s SMF, Ex. 18, CBSZ-12224495-24-SC Application Information [Doc. No. 17-18].

[22] Def.'s SMF, Ex. 18, CBSZ-12224495-24-SC Application Information [Doc. No. 17-18].

[23] Def.'s SMF, Ex. 16, Def.'s Resp. to Interrogatory 9 [Doc. No. 17-16].

[24] Def.'s SMF, Ex. 19, CBSZ-012256575-24-SC Application Information [Doc. No. 17-19].

[25] Def.'s SMF, Ex. 20, Watson Interview Evaluations [Doc. No. 17-20]; Ex. 25, 1/3/24 Certificate of Eligibles [Doc. No. 17-25].

[26] Def.'s SMF, Ex. 20, Watson Interview Evaluations [Doc. No. 17-20]; Ex. 21, Moorbeck-Dechant Affidavit [Doc. No. 17-21]; Ex. 22, Thornabar Affidavit [Doc. No. 17-22]; Ex. 23, Castagna Affidavit [Doc. No. 17-23].

one interviewed claimed he was aware of the complaints.[27] Ms. Watson disputes the extent of the interviewers' knowledge of the complaints and their reactions thereto.[28] Following the interviews, Ms. Watson received a combined score of 55.[29] The individual who was hired for the Housekeeping Aide Supervisor who received a combined interview score of 82 based on a panel of two interviewers.[30] He was selected for the position on January 3, 2024.[31]

Ms. Watson claims there was another supervisor position for which employee Deitra Jackson was selected.[32] Defendant disputes this claim and states that the only other two positions for which Ms. Watson applied did not result in hiring of a candidate.[33]

On May 3, 2024, Ms. Watson reported a May 2, 2024 incident to Kelly Nowak, Chief of Nutrition and Food Service.[34] Ms. Watson reported that on May 2, another employee, a "heavy set dark skin African American" woman, approached her and asked if she was a man because she heard that a woman at EMS was transgender.[35] In notifying Ms. Nowak, Ms. Watson stated that she was "severely offended by the remark," felt "harassed and sexually harassed," and felt the comment created a hostile working environment.[36]

---

[27] Def.'s SMF, Ex. 21, Moorbeck-Dechant Affidavit [Doc. No. 17-21]; Ex. 22, Thornabar Affidavit [Doc. No. 17-22]; Ex. 23, Castagna Affidavit [Doc. No. 17-23].

[28] Pl.'s Resp. to Def.'s Am. SMF ¶¶ 33-35 [Doc. No. 19-1].

[29] Def.'s SMF, Ex. 20, Watson Interview Evaluations [Doc. No. 17-20]; Ex. 21, Moorbeck-Dechant Affidavit [Doc. No. 17-21]; Ex. 22, Thornabar Affidavit [Doc. No. 17-22]; Ex. 23, Castagna Affidavit [Doc. No. 17-23].

[30] Def.'s SMF, Ex. 24, Harrison Interview Evaluations [Doc. No. 17-24].

[31] Def.'s SMF, Ex. 25, 1/3/24 Certificate of Eligibles [Doc. No. 17-25].

[32] Pl.'s Add'l Statement of Material Facts ¶ 25 [Doc. No. 19-2]; Ex. A, Watson Dep. at 145-146 [Doc. No. 19-3].

[33] Def.'s Resp. to Add'l Statement of Material Facts ¶ 25 [Doc. No. 21].

[34] Def.'s SMF, Ex. 26, 5/2/24 Watson Statement [Doc. No. 17-26]; Ex. 27, Nowak Affidavit [Doc. No. 17-27].

[35] Def.'s SMF, Ex. 26, 5/2/24 Watson Statement [Doc. No. 17-26].

[36] *Id*.

Ms. Nowak's affidavit states that shortly upon receipt of Ms. Watson's report, Ms. Nowak forwarded the concern to Human Resources and notified Ms. Watson that the complaint would be forwarded.[37] On May 6, 2024, Rezaur Rahman, the Chief of EMS, spoke to Ms. Watson to confirm that the woman involved in the incident was Shere Burnett.[38] Following a fact finding, of which Ms. Watson contests the adequacy, Ms. Burnett was required to complete a training course entitled "Sexual Harassment: What Employees Need to Know" on May 17, 2024.[39]

On June 24, 2024, an EMS employee witnessed two contractors, Brittany and Jade, laughing and saying "him her" and "them they."[40] Later that day, the employee who heard these comments told Ms. Watson that Brittany and Jade were "making fun of her gender."[41] On June 26, 2024, Charles Carter, Assistant Housekeeping Officer, emailed Ms. Watson requesting she send "a report of contact with the names of the individuals involved" following a discussion with Ms. Watson regarding harassment.[42] In sworn responses to an EEO investigation, Mr. Carter claimed that Ms. Watson did not respond to this request, but he learned the names the day of the incident.[43] Jade, who was involved in the June 24 incident, is Mr. Carter's step-daughter.[44]

Three days after the June 24 incident, on June 27, 2024, there was some dispute or altercation involving Ms. Watson, Jade, and another contractor named Brianna.[45] That day, Ms.

[37] Def.'s SMF, Ex. 27, Nowak Affidavit [Doc. No. 17-27].

[38] *Id*.

[39] *Id*.; Def.'s SMF, Ex. 28, Cert. of Completion [Doc. No. 17-28].

[40] Def.'s SMF, Ex. 29, Trader Affidavit [Doc. No. 17-29].

[41] *Id*.

[42] Def.'s SMF, Ex. 30, 6/26/24 Carter Email [Doc. No. 17-30].

[43] Def.'s SMF, Ex. 31, Carter Affidavit [Doc. No. 17-31]; Ex. 33, 4/29/25 Carter Email [Doc. No. 17-33].

[44] Def.'s SMF, Ex. 31, Carter Affidavit [Doc. No. 17-31].

[45] Def.'s SMF, Ex. 32, 6/27/24 Watson Email [Doc. No. 17-32].

Watson reported the encounter to Theresa Bill, EEO program manager.[46] She stated that Jade and Brianna yelled derogatory remarks and called her a man in a demeaning manner.[47] She said the situation escalated, Jade said she could say whatever she wanted, attempted to charge Ms. Watson but was held back, and said that she would call her dad, Mr. Carter, to get Ms. Watson fired.[48] Ms. Watson said she called Mr. Carter following the incident, who told her she could take the rest of the day off and he would handle the situation.[49] The same day, Jade, Brittany, and Brianna were removed from the area.[50] Ms. Watson contests whether their contracts were terminated on June 27, 2024 or at some later point. No evidence is provided that contradicts Mr. Carter's claims that the contracts were terminated and the contractors' employer that Jade, Brittany, and Brianna could not return to the site.[51]

Also on June 27, 2024, another employee told Ms. Watson that he overheard Deitra Jackson tell coworkers to "go and get that chick," referring to Ms. Watson.[52] Ms. Watson claimed she was informed of a video of the instruction by Ms. Jackson.[53] No such video has been identified.[54]

---

[46] *Id*.

[47] *Id*.

[48] *Id*.

[49] *Id*.

[50] Def.'s SMF, Ex. 33, 4/29/25 Carter Email [Doc. No. 17-33]; Ex. 34, 6/27/24 Bill Email [Doc. No. 17-34].

[51] Def.'s SMF, Ex. 33, 4/30/25 Carter Email [Doc. No. 17-33]; Ex. 35, Watson Affidavit [Doc. No. 17-35].

[52] Def.'s SMF, Ex. 35, Watson Affidavit [Doc. No. 17-35].

[53] *Id*.

[54] *Id*.; Def's SMF, Ex. 36, Investigative Summary [Doc. No. 17-36] (Mr. Carter and Mr. Rahman stated that they had no knowledge of allegations that Ms. Jackson encouraged the June 27 encounter).

On August 2, 2024, Ms. Watson filed a second EEO complaint, wherein she alleged she was the victim of a hostile work environment, harassment, retaliation, and discrimination on the basis of sex.[55] Specifically, this complaint alleged she was:

> subjected to a hostile work environment based on Reprisal and Sex by [RR], Chief of [EMS], [CC], Assistant Chief of EMS, and Deitra Jackson (DJ), Housekeeping aid, by failing to respond to reports of harassment, and as evidenced by the following events:
>
> 1. On May 2, 2024, an employee approached [Ms. Watson] and asked if she was transgender due to hearing that EMS had a transgender employee.
> 2. On June 24, 2024, an employee informed [Ms. Watson] that the women on the [third] shift were referring to her as a "man, it, he, she . . . ."
> 3. On June 27, 2024, [Ms. Watson] was verbally attacked and experienced an attempted physical [assault] by three co-workers; the daughter and two nieces of CC who called [Ms. Watson] a man and made jokes about her.
> 4. On June 27, 2024, after the above attack, [Ms. Watson] was made aware of a video where DJ had ordered the co-workers to "go and get that chick" in order to instigate a fight.[56]

On December 27, 2024, the Department of Veterans Affairs accepted Ms. Watson's second EEO complaint.[57]

On October 31, 2024, just under two months after filing her second EEO complaint, Ms. Watson was involved in an altercation at the VA with Donya Goodwin, Ebony Harper, and Stephanie Mayes.[58] The details of this altercation are contested. Ms. Goodwin claims that Ms. Watson pushed her, and Ms. Watson claims that she stepped in between an argument between Ms. Goodwin and Ms. Harper and that she was trying to de-escalate the situation.[59] Ms. Harper and Ms. Mayes claimed that Ms. Watson was "trying to break the tension" and "cool the

[55] Def.'s SMF, Ex. 7, 8/2/24 EEO Complaint [Doc. No. 17-7].

[56] Def.'s SMF, Ex. 8, 2/26/25 Letter from Dep't of Veterans Affairs [Doc. No. 17-8].

[57] Def.'s SMF, Ex. 11, 12/27/24 Letter from Dep't of Veterans Affairs [Doc. No. 17-11].

[58] Def's SMF, Ex. 37, 10/31/24 Goodwin Statement [Doc. No. 17-37]; Ex. 38, 10/31/24 Harper Statement [Doc. No. 17-38]; Ex. 39, 10/31/24 Watson Statement [Doc. No. 17-39]; Ex. 40, 10/31/24 Mayes Statement [Doc. No. 17-40]; Ex. 41, 10/31/24 Vargas Statement [Doc. No. 17-41].

[59] Def's SMF, Ex. 37, 10/31/24 Goodwin Statement [Doc. No. 17-37]; Ex. 39, 10/31/24 Watson Statement [Doc. No. 17-39].

situation down."[60] A witness, Norberto Vargas, claimed that he observed an altercation between two women, that Ms. Watson asked him to help her, and he got in between the two women.[61]

The VA reviewed video footage of the October 31 incident, and the deciding official determined that the video showed that Ms. Watson was involved in the altercation and did not appear to be only trying to break up the fight.[62] On February 10, 2025, the VA notified Ms. Watson that she would be suspended for three days—from February 24-26, 2025—for the October 31 altercation, based on unprofessional conduct.[63] Ms. Watson served the suspension and returned to her position as a Work Leader.[64]

On February 26, 2025, the Department of Veterans Affairs accepted an amendment to the second EEO complaint, which added a fifth discrete event—the February 2025 three-day suspension.[65]

On November 1, 2024, Ms. Watson was in a verbal altercation with Wayne Gilyard.[66] The details of the altercation are contested. Mr. Gilyard claims that Ms. Watson yelled and cursed at him and called him old,[67] and Ms. Watson claims that she asked Mr. Gilyard not to spread rumors about the October 31, 2024 altercation that had happened the day before.[68] Ms. Watson denied raising her voice, using profanities, insulting Mr. Gilyard, yelling "mind your

---

[60] Def's SMF, Ex. 38, 10/31/24 Harper Statement [Doc. No. 17-38]; Ex. 40, 10/31/24 Mayes Statement [Doc. No. 17-40].

[61] Def's SMF, Ex. 41, 10/31/24 Vargas Statement [Doc. No. 17-41].

[62] Def's SMF, Ex. 42, 2/5/24 Dep't of Veterans Affairs Mem. [Doc. No. 17-42].

[63] Def.'s SMF, Ex. 43, 2/10/25 Suspension Notice [Doc. No. 17-43].

[64] Def.'s SMF, Ex. 44, 2/27/25 SF-50 [Doc. No. 17-44].

[65] Def.'s SMF, Ex. 8, 2/26/25 Letter from Dep't of Veterans Affairs [Doc. No. 17-8].

[66] Def.'s SMF, Ex. 45, Factfinding Report Mem. [Doc. No. 17-45].

[67] Def.'s SMF, Ex. 46, Gilyard Interview [Doc. No. 17-46].

[68] Def.'s SMF, Ex. 47, Watson Interview [Doc. No. 17-47].

damn business," telling Mr. Gilyard "to stay in geriatrics," telling Mr. Gilyard to shut up, or following Mr. Gilyard when he tried to leave.[69] The VA took statements from several witnesses and determined that Ms. Watson's behavior was unprofessional, disruptive, and violated the VA's core mission and values.[70] Based on this determination, the VA suspended Ms. Watson for five days—from April 7 to April 11, 2025—for unprofessional conduct. Ms. Watson served the suspension and returned to her position as Work Leader.[71] There is no evidence before the Court that Ms. Watson raised this suspension in either EEO complaint or amended either complaint to include the five-day suspension.

On July 17, 2024, Ms. Watson filed the instant complaint. Following discovery, Defendant now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 on Count I for disparate treatment and Count III for retaliation. Defendant does not move for summary judgment on Count II for hostile work environment.

## II. LEGAL STANDARD

A court will award summary judgment on a claim, or part of a claim, where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[72] A fact is "material" if resolving the dispute over the fact "might affect the outcome of the suit under the governing [substantive] law."[73] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[74]

---

[69] *Id.*

[70] Def.'s SMF, Ex. 45, Factfinding Report Mem. [Doc. No. 17-45]; Ex. 48, 4/2/25 Suspension Notice [Doc. No. 17-48].

[71] Def.'s SMF, Ex. 49, 4/12/25 SF-50 [Doc. No. 17-49].

[72] Fed. R. Civ. P. 56(a).

[73] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[74] *Id.*

If the Court determines that a "movant shows that there is no genuine dispute as to any material fact and the movant is entitlement to judgment as a matter of law" on part of a claim, the Court shall grant summary judgment on that part.[75] Even if the Court "does not grant all the relief requested by the motion, it may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case."[76]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor."[77] Such a requirement does not mean that all facts must be viewed in favor of the non-moving party, but only those inferences and assumptions that are reasonable.[78] Further, a court may not weigh evidence or make credibility determinations.[79] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[80] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[81] This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[82] Therefore, if, after making all reasonable inferences in favor of the

---

[75] Fed. R. Civ. P. 56(a) ("The court ***shall*** grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitlement to judgment as a matter of law.") (emphasis added).

[76] Fed. R. Civ. P. 56(g).

[77] *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[78] *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir. 1995).

[79] *Boyle v. Cty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

[80] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[81] *Anderson*, 477 U.S. at 249-50 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87; citing *Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290) (internal citations omitted).

[82] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir. 1976)).

non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[83]

## III. Discussion

### A. Retaliation

Title VII protects against retaliation and provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any many in an investigation, proceeding, or hearing under this subchapter.[84]

"To establish a prima facie case of retaliation under Title VII, a plaintiff must tender evidence that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."[85]

Employees who participate in certain Title VII proceedings and those who oppose discrimination unlawful under Title VII are protected by the anti-retaliation provision.[86] In order to be protected, the first element of the provision requires that "the employee must hold an objectively reasonable belief, in good faith," that the employer's activity they oppose, or participate in a proceeding against, is unlawful under Title VII.[87]

The second element of "the antiretaliation provision, unlike the substantive provision [of Title VII], is not limited to discriminatory action that affects the terms and conditions of

---

[83] *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[84] 42 U.S.C. § 2000e-3(a).

[85] *Moore v. City of Philadelphia*, 461 F.3d 331, 340-341 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)) (internal quotations omitted).

[86] *Id*. at 341 (citing *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006)).

[87] *Id*. (citing *Clark Cnty. v. Breeden*, 532 U.S. 268, 271 (2001)).

employment."[88] Thus, "a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' "[89]

Third, "a plaintiff must show a causal connection between the plaintiff's opposition to, or participation in proceedings against, unlawful discrimination and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[90] The element "identif[ies] what harassment, if any, a reasonable jury could link to a retaliatory animus."[91] "The onus is on the plaintiff to establish causation . . . to demonstrate a causal connection as part of the prima facie case."[92]

If the plaintiff establishes a prima facie case of retaliation, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason" for its conduct.[93] If the employer does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."[94]

Defendant VA moves for summary judgment on the grounds that Ms. Watson has failed to establish a *prima facie* case of retaliation.

---

[88] *Burlington Northern & Santa Fe Rwy. Co. v. White*, 548 U.S. 53, 64 (2006).

[89] *Moore*, 461 F. 3d at 341 (quoting *Burlington Northern*, 548 U.S. at 68).

[90] *Id*. at 341-42.

[91] *Jensen v. Potter*, 435 F.3d 444, 449-50 (3d Cir. 2006), overruled on other grounds by

[92] *Carvalho-Grevious v. Delaware State Univ*., 851 F. 3d 249, 257 (3d Cir. 2017).

[93] *Moore*, 461 F.3d at 342 (quoting *Krouse v. Am. Sterilizer Co*., 126 F.3d 494, 500-01 (3d Cir. 1997)).

[94] *Id*.

Plaintiff alleges that she engaged in protected activities including: filing a formal EEO complaint in March 2023 alleging sex discrimination, filing a formal EEO complaint in August 2024 alleging sex discrimination and retaliation, making internal complaints to her supervisors, HR, and the union about harassment and differential treatment.[95] It is undisputed that Ms. Watson filed the two EEO complaints, reported harassment to Mr. Carter following the June 24, 2024 and June 27, 2024 incidents, reported the May 2, 2024 incident to Ms. Nowak, who notified HR, discussed the May 2 incident with Mr. Rahman, and reported the June 27, 2024 incident to Ms. Bill. Ms. Watson reported harassment to Mr. Carter, Mr. Rahman, and Ricardo Lindsay. Further claims of additional reports to management and the union are disputed and not conclusively established on the record before the Court.[96]

Ms. Watson also claims she suffered multiple adverse actions sufficient to dissuade a reasonable worker from engaging in protected conduct, including: the three-day February 2025 suspension, the five-day April 2025 suspension, "removal from leadership duties and isolation from staff," denial of a promotion following interviews, and an assignment to overnight shifts at the nursing home.[97] It is undisputed that Ms. Watson faced the two suspensions, was not promoted in January 2024, and was reassigned in 2023 to nursing home overnight shifts (before being returned following termination of her first EEO complaint in Jan. 2024).[98] However, it is disputed whether Ms. Watson was removed from leadership duties and was isolated from staff.

---

[95] Opp'n at 6-7 [Doc. No. 19].

[96] Pl.'s Statement of Add'l Material Facts ¶¶ 10-15, 37-41, 93-99 [Doc. No. 19-2] (citing testimony in depositions without identifying corroborating evidence); *see also* Def.'s Resp. to Statement of Add'l Material Facts ¶¶ 10-15, 37-41, 93-99 [Doc. No. 21].

[97] Opp'n at 7 [Doc. No. 19].

[98] Pl.'s Statement of Add'l Material Facts ¶ 24 [Doc. No. 19-2]; Def.'s Resp. to Statement of Add'l Material Facts ¶ 24 [Doc. No. 21].

1. Exhaustion

Defendant argues that Ms. Watson has failed to establish a prima facie case of retaliation for failure to exhaust administrative remedies regarding several of the adverse actions of which she complains. "It is a basic tenet of administrative law that a plaintiff must exhaust all required administrative remedies before bringing a claim for judicial relief."[99] Title VII is the "exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination."[100] Exhaustion of a Title VII claim "requires both consultation with an agency counselor and filing a formal EEOC complaint within the required times."[101] A federal employee who complains of Title VII discrimination may file a "mixed case complaint" with her employer's EEO office, as Ms. Watson did.[102] Following receipt of its final decision, the employee has thirty days to file a civil action in the district court.[103]

In order to fully exhaust a claim, an employee's EEO complaint must put the agency on notice of the charges she brings against the agency.[104] The Third Circuit has held that "the parameters of the civil action in the district court are defined by the scope of the [EEO] investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of proceedings."[105] "[A] district court may assume jurisdiction over additional charges if they are reasonably within the scope of the

---

[99] *Robinson v. Dalton*, 107 F.3d 1018, 1020 (3d Cir. 1997) (citing *McKart v. United States*, 395 U.S. 185, 193 (1969)).

[100] *Brown v. GSA*, 425 U.S. 820, 829 (1976).

[101] *Robinson*, 107 F.3d at 1021.

[102] *Slingland v. Donahoe*, 542 Fed. App'x 189, 192 (3d Cir. 2012).

[103] *Id*.

[104] *Anjelino v. New York Times*, 200 F.3d 73, 93-96 (3d Cir. 1999).

[105] *Ostapowicz v. Johnson Bronze Co*., 541 F.2d 394, 398–99 (3d Cir.1976), cert. denied, 429 U.S. 1041, *reh. denied*, 430 U.S. 911 (1977) (citations omitted).

complainant's original charges and if a reasonable investigation by the [EEO] would have encompassed the new claims."[106] The Third Circuit has also recognized that "charges are most often drafted by one who is not well versed in the art of legal description.... [T]he scope of the original charge should be liberally construed."[107]

Ms. Watson argues that all of her claims are adequately exhausted because her "suspensions, denials of promotion, and ongoing retaliation arise from the same continuing pattern" and these claims are "reasonably related to the underlying EEO charge."[108] As discussed, Ms. Watson filed two EEO complaints, the first of which alleged "sex harassment, discrimination gender identity, [hostile] work environment, sexual orientation,"[109] and the second of which alleged "sex harassment, retaliation, [and] discrimination."[110]

Neither of these complaints alleged disparate treatment on the basis of Ms. Watson's sex nor put the VA on notice of such a claim. However, through the course of the EEO investigation, Ms. Watson's complaint regarding the February 2025 suspension was reviewed as a disparate treatment claim.[111] Neither EEO complaint raised the April 2025 suspension or Ms. Watson's non-promotion following interviews in January of 2024. However, based on Ms. Watson's complaints, the EEO investigation could reasonably be expected to grow to encompass the April 2025 suspension and non-promotion in relation to her retaliation and disparate treatment. Accordingly, Ms. Watson has established sufficient exhaustion of her claims.

---

[106] *Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir. 1984).

[107] *Hicks v. ABT Assoc. Inc.*, 572 F.2d 960, 965 (3d Cir. 1978).

[108] Opp'n at 10 [Doc. No. 19].

[109] Def.'s SMF, Ex. 6, 03/09/23 EEO Complaint [Doc. No. 17-6].

[110] Def.'s SMF, Ex. 7, 08/02/24 EEO Complaint [Doc. No. 17-7].

[111] *See* Pl.'s Post-Briefing Notice, Ex. A [Doc. No. 22-1].

2. Adverse Employment Action

Defendant next argues that Ms. Watson has not proffered sufficient evidence of adverse employment action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[112] Regarding Ms. Watson's two suspensions, Defendant points to *McCullers v. Napolitano*, which held that evidence of a fourteen day suspension, along with certain other actions, would not have dissuaded a reasonable worker from engaging in protected EEO activity.[113] In *Burlington Northern*, the Supreme Court recognized that "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." [114] Furthermore, the Court explained that the legal standard for adverse employment action "speaks in general terms rather than specific prohibited acts. . ., for an 'act that would be immaterial in some situations is material in others.'"[115] Thus, the Third Circuit's ruling in *McCullers* does not establish a per se rule on suspensions, and the Court must look to the facts alleged.

Based on the record before the Court, Ms. Watson has not provided evidence such that a reasonable jury could conclude that the two suspensions would have dissuaded a reasonable worker from making or supporting a charge of discrimination. There is no evidence regarding the context of the suspensions that would support such a conclusion.

---

[112] *Burlington Northern*, 548 U.S. at 68.

[113] 427 F. App'x 190, 196 (3d Cir. 2011).

[114] *Burlington Northern*, 548 U.S. at 69 (quoting *Onacle v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998)).

[115] *Id*. (quoting *Washington v. Illinois Dept. of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005)).

Ms. Watson's claims of being removed from leadership duties and isolation from staff also do not rise to the level of an adverse employment action, because the record does not sufficiently detail the specifics of any reduced duties or isolation.

Finally, Ms. Watson's temporary assignment to overnight shifts at the nursing home also does not rise to the level of an adverse employment action because Ms. Watson has not proffered evidence regarding the context and implications of this assignment, other than noting that she was alone on the shift. However, Title VII does not protect against "those petty slights or minor annoyances that often take place at work and that all employees experience."[116]

It is undisputed that a failure to promote is an adverse employment action governed by Title VII.

3. Causal Connection Between Protected Activity and Adverse Action

Because Ms. Watson has presented evidence that she suffered an adverse employment action, the Court must determine whether there is a causal connection between Ms. Watson's protected activity and the failure to promote. "A plaintiff may rely on a broad array of evidence to demonstrate a causal link between the protected activity and the adverse employment action taken," including by "proffering evidence of an employer's inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity unusually suggestive of retaliatory motive."[117]

Prior to her non-promotion, Ms. Watson had filed her first EEO complaint, which had been accepted and was still under investigation. Other relevant evidence includes the cancellation of two prior positions Ms. Watson applied to and her assignment to nursing home

---

[116] *Burlington Northern*, 548 U.S. at 68.

[117] Carvalho-Grevious v. Del. State Univ., 851 F.3d 249, 260 (3d Cir. 2017).

overnights during the pendency of her EEO complaint. Ms. Watson's second EEO complaint, suspensions, and other altercations post-dated the non-promotion, so they are not relevant to the issue of causation.

Ms. Watson argues that a pattern of antagonism, timing of actions, and evidence of a retaliatory motive demonstrate causation. First, Ms. Watson identifies continued taunts, ignored reports, and "mocking" regarding the gender pronoun training. However, the record does not establish when these allegations took place and if they occurred before Ms. Watson's non-promotion. There is no record evidence on the date of the pronoun training nor does Ms. Watson present allegations of taunting and ignored complaints that occurred after filing her first EEO complaint but before her nonpromotion.

Second, Ms. Watson filed her EEO complaint in March of 2023 and her nonpromotion occurred in January 2024. At first look, this timing is fairly extended. However, the EEO complaint was not accepted until July 28, 2023, and Ms. Watson first applied for a promotion on October 26, 2023. This first job opening was cancelled, and the reason for the cancellation is disputed. Ms. Watson was interviewed for the promotion on November 20, 2023, prior to her application to the second or third openings. Ms. Watson was interviewed by three panelists, one of whom was aware of her EEO activity and two who denied knowledge but whose knowledge is disputed. There are also discrepancies between the interview process for Ms. Watson and the employee who was ultimately hired. Ms. Watson was interviewed by three panelists, but the person who was hired was interviewed by only two panelists. The interviewers' awareness and action based on Ms. Watson's EEO activity is a disputed question of fact.

Given the repeated cancellations of job openings for which Ms. Watson applied, proximity to Ms. Watson's EEO activity, and disparities between the interview process for Ms.

Watson and the candidate who was hired, Ms. Watson has established a prima facie case of retaliation for her non-promotion.

Thus, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason" for its non-promotion of Ms. Watson. Defendant argues that it has established a non-retaliatory reason for its selection of another candidate for the position because the other candidate had a higher combined interview score, which is a legitimate, nondiscriminatory reason. Thus, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."[118] Indeed, Ms. Watson argues that this justification relies on the subjective decisions of the interviewers, who she claims were aware of her protected conduct. The Court may not weigh the evidence at summary judgment, so Defendant's disputed justification for cancelling the initial two job postings and selecting another candidate for the job does not warrant summary judgment.

Thus, at the summary judgment stage, Defendant has not established that there is no genuine dispute of material fact, and summary judgment as to the retaliation claim will be denied based on Ms. Watson's non-promotion. Summary judgment will be granted on the retaliation claim as to Ms. Watson's suspensions, nursing home assignment, and isolation and reduction of work leader duties.

### B. Disparate Treatment

Title VII also protects against disparate treatment and provides that "It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation,

[118] *Moore*, 461 F.3d at 342.

terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin."[119]

In order to establish a claim of disparate treatment, a plaintiff must establish that (1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) similarly situated employees outside her class were treated more favorably.[120]

Ms. Watson asserts two grounds for her disparate treatment claim. First, she claims that she was subjected to "discipline involving contested accounts while other employees engaged in similar or worse conduct without consequence."[121] While Ms. Watson does not cite to such incidents, the Court surmises that she refers to the October 31 and November 1, 2024 incidents that resulted in her two suspensions. Ms. Watson has not otherwise identified incidents wherein she was subjected to discipline regarding a contested account. Second, Ms. Watson claims she suffered disparate treatment based on her non-promotion.

The Court will first evaluate the claim as to her suspensions for the October 31, 2024, and November 1, 2024 incidents. As a preliminary matter, Ms. Watson is a member of a protected class based on her sex. It is undisputed that she was qualified for her position. As the Court has determined that the suspensions are not adverse employment actions, the disparate treatment claim fails as to both suspensions.

The Court notes that even if the suspension was an adverse employment action, the other individuals involved in the disputed October 31, 2024 incident are not employees outside Ms. Watson's class—all three other individuals were also women, so the claim would still fail.

[119] 42 U.S.C. § 2000e-2(a)(1).

[120] *Jones v. Sch. Dist.*, 198 F.3d 403, 410–11 (3d Cir. 1999).

[121] Opp'n at 9 [Doc. No. 19].

Regarding her non-promotion, Ms. Watson is a member of a protected class (woman) and is qualified for the position. Ms. Watson's non-promotion is an adverse employment action, even under the substantive provisions of Title VII. The Supreme Court has interpreted "adverse employment action" to mean "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[122] Finally, Rodney Hariston was selected for the position. The parties refer to Hariston as "he" and presume he is not a member of the protected class. Defendant argues that Hariston was not treated more favorably than Ms. Watson as a female employee. Defendant's sole argument is that the three-person interview panel for Ms. Watson consisted of two women and one man. The composition of the panel does not determine whether Ms. Watson was subjected to disparate treatment. Ms. Watson has established a prima facie case of disparate treatment for her non-promotion. Defendants again argue that their nondiscriminatory reason for not selecting Ms. Watson was the higher combined interview score for Hariston. As with the retaliation claim on this issue, there is a genuine dispute of material fact whether Defendant's nondiscriminatory reason is false. Accordingly, summary judgment will be granted on the disparate treatment claim as to her suspensions and summary judgment will be denied on the claim as to Ms. Watson's non-promotion.

## IV. Conclusion

For the reasons stated herein, Defendant's Motion for Summary Judgment will be granted on Counts I and III as to Ms. Watson's claims regarding her suspensions, isolation and reduction

---

[122] *Remp v. Alcon Labs., Inc.*, 701 F. App'x 103, 106-07 (3d Cir. 2017) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

of duties, and reassignment. The Motion for Summary Judgment will be denied on Counts I and III as to Ms. Watson's claims regarding her non-promotion. An order will be entered.